## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Cheryl L. Schultz,                          Case No. _____

        Plaintiff,

v.                                          **COMPLAINT**

3M Company,

        Defendant.

_____

Plaintiff, Cheryl L. Schultz, for her Complaint, states and alleges as follows:

## <u>JURISDICTION AND VENUE</u>

1.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and principles of federal common law developed thereunder.

2.     This Court has jurisdiction of this action pursuant to 29 U.S.C. § 1132(e)(1), ERISA § 502(e)(1).

3.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2), ERISA § 502(e)(2), because the case involves an employee-benefit plan administered to an employee who worked in this district and Defendant conducts business in this district. The employee-benefit plans at issue in this complaint also prescribe the United States District Court for the District of Minnesota as the exclusive venue for all litigation arising in connection with the plan.

## PARTIES

4.      Plaintiff Cheryl L. Schultz ("Schultz" or "Plaintiff") is a 46-year-old woman who resides in New Richmond, Wisconsin.

5.      Schultz's date of disability is February 28, 2014.  Schultz was 45 years of age on the date of disability.

6.      On the date of disability, Schultz was insured through a short-term disability policy and long-term disability policy sponsored and administered by her employer, 3M Company ("3M"). The short-term disability policy ("STD Plan") and long-term disability plan ("LTD Plan") are employer-sponsored welfare benefits plans within the context of, and governed by, ERISA.

7.      3M Company is headquartered in Maplewood, Minnesota and is licensed to do and does business in the State of Minnesota.

8.      The STD and LTD Plan Administrator is 3M's Vice President of Global Compensation and Benefits.

9.      Sedgwick CMA serves the Claims Administrator for the STD and LTD Plans.

## FACTUAL ALLEGATIONS

10.      Schultz began her employment with 3M in 1996.  She became an Inventory Analyst I in 3M's medical department in 2007 and held that position through July 2014. As an Inventory Analyst I, Schultz forecast and scheduled global procurement operations and provided inventory data analysis for 3M.

11.    The STD and LTD Plans apply to all employees classified by 3M or participating 3M affiliates as a regular full-time or part-time employee.

12.    As a regular full-time employee, Schultz became eligible for, and did participate in, the STD and LTD Plans.

13.    At all relevant times, Defendant self-insured the STD and LTD Plans.

14.    At all relevant times, Schultz worked for 3M at its office location on Oakdale, Minnesota.

**STD Plan Features**

15.    To receive disability benefits under the STD Plan, the Claims Administrator must determine that the insured: is "eligible and covered under the Plan"; meets "the Plan's definition of Disability (including providing Objective Medical Evidence of [] Disability, when requested by the Claims Administrator)"; claims a disability not excluded from coverage under the STD Plan; and satisfies "all other eligibility requirements under the Plan."

16.    Under the STD Plan, an insured is considered to be disabled when the Claims Administrator determines that: "you are unable to perform the material duties of your regular and customary occupation at 3M, or any other appropriate job offered by 3M, due to an illness, injury, pregnancy, or other medical condition." The insured must also "be under the regular and continuous care of a licensed Health Care Provider unless such treatment is not medically necessary given the nature of [the insured's] disability."

17.     The STD Plan does not prescribe a waiting period.  If the insured qualifies for STD coverage, benefits are "payable on the first date [the insured meets] the Plan's definition of Disability."

18.     Under the STD Plan, disability benefits are payable for up to 26 weeks in a benefit year.  STD benefits are calculated based on the insured's base pay and the year of employment when benefits are sought.  As an employee with 18 years of service, Schultz was eligible for the 26 weeks of STD benefits at 100% of her base pay.

19.     Base pay for the purpose of STD benefits excludes "any variable pay, including without limitation, annual incentive pay, sales incentive pay, management objective, team/plant-based incentive pro-share or gain share, overtime or shift differential premiums."

20.     Under the STD Plan, "Objective Medical Evidence" means "the medical demonstration of anatomical, physiological, or psychological abnormalities manifested by signs or laboratory findings, apart from an employee's perception of his or her own mental or physical impairments."  The plan goes on to describe this evidence as follows: "These signs are observed through medically acceptable clinical techniques such as medical history and physical examination.  Laboratory findings are manifestations of anatomical, physiological, or psychological phenomena demonstrated by chemical, electrophysiological, roentgenological, or psychological tests."

21.     The STD Plan cautions: "A statement from a physician without objective medical evidence is not sufficient proof of a qualifying disability.  It is strongly recommended that you work with your doctor to make sure that the Claims Administrator

is presented with all available evidence (e.g., medical examination, tests) to support your claim that you meet the definition of a qualifying disability."

22.     The STD Plan provides certain bases to reduce or terminate an insured's benefits.  If the insured is "no longer eligible for or covered under the Plan" or "no longer meet[s] the definition of Disability under the Plan as determined by the Claims Administrator (benefits will end even if there is no position available for you at 3M)," benefits may terminate.

23.     Coverage under the STD Plan ends, *inter alia*, when an insured's employment ends or when the insured is no longer eligible for coverage.

**LTD Plan Features**

24.     To receive disability benefits under the LTD Plan, the Claims Administrator must determine that the insured: is "eligible and covered under the Plan"; meets "the Plan's definition of Disability (including providing Objective Medical Evidence of [] Disability, when requested by the Claims Administrator)"; claims a disability not excluded from coverage under the LTD Plan; exhausts 3M's short-term disability benefits; and satisfies "all other eligibility requirements under the Plan."

25.     Under the LTD Plan, an insured is considered to be disabled when the Claims Administrator determines that: "you are unable to perform the material duties of your regular and customary occupation at 3M, or any other appropriate job offered by 3M, due to an illness, injury, pregnancy, or other medical condition."  The insured must also "be under the regular and continuous care of a licensed Health Care Provider unless such treatment is not medically necessary given the nature of [the insured's] disability."

26.     After 18 months of disability-benefits payments, an insured is considered to be disabled when the Claims Administrator determines that the insured is "totally disabled"; "unable to perform the material duties of any occupation or employment for which [the insured is] or may be become, reasonably qualified by training, education or experience"; and "unable to earn 70% or more of [the insured's] 'Planned Total Cash Compensation' (as defined in the *Amount of Long Term Disability Benefits* section of the SPD) while working in any occupation or employment."   The on-going obligation to be under medical care also continues past the first 18 months.

27.     Under the LTD Plan, "Objective Medical Evidence" means "the medical demonstration of anatomical, physiological, or psychological abnormalities manifested by signs or laboratory findings, apart from an employee's perception of his or her own mental or physical impairments."   The plan goes on to describe this evidence as follows: "These signs are observed through medically acceptable clinical techniques such as medical history and physical examination.   Laboratory findings are manifestations of anatomical, physiological, or psychological phenomena demonstrated by chemical, electrophysiological, roentgenological, or psychological tests."

28.     The LTD Plan cautions: "A statement from a physician without objective medical evidence is not sufficient proof of a qualifying disability.   It is strongly recommended that you work with your doctor to make sure that the Claims Administrator is presented with all available evidence (e.g., medical examination, tests) to support your claim that you meet the definition of a qualifying disability."

29.     Under the LTD Plan, "Planned Total Cash Compensation" means the insured's "planned annual base pay plus any planned variable pay, at the time LTD begins."  The plan goes on to define "variable pay" as "annual incentive plan pay, sales incentive pay and, management objective pay."  It also excludes "overtime or shift differential premiums" and "the value of any equity or other stock-related compensation awarded or paid or payable to [the insured] or any compensation resulting from the sale of 3M stock or exercise of 3M stock options" from the definition of "Planned Total Cash Compensation."

30.     Under the LTD Plan, disability benefits end at the later of (1) the first month following the insured's 65th birthday (or on the insured's birthday if the insured was born on the first day of the month) or (2) the first of the month following five (5) years of benefits payments if payments began after the insured reached sixty (60) years of age.

31.     The disability benefit under the LTD Plan equals 60% of the insured's Planned Total Cash Compensation.  The calculation of benefits changes depending on the insured's receipt of Social Security benefits.  Benefits can also be reduced based on the receipt of other defined wage-replacement benefits.

### Employee and Income Information

32.     Schultz has had a long career with 3M.  She worked in 3M's medical department from 1996 to 2014 as a Senior Service Tech, Bids/Contracts Administrator, and Inventory Analyst.   In 2005, Schultz obtained a college degree in business management while working for 3M.

33.     Schultz's job as an Inventory Analyst I for 3M required her to work cooperatively and efficiently with 3M's IT, management, manufacturing, engineering, technical, and customer-service departments.  She executed annual inventory counts for compliance purposes, led teams to implement medical-document imaging, and managed the linking of an old material requirements planning system to a new system.

34.     At the time of her disability on February 28, 2014, Schultz performed sedentary work that required full days in an office environment.  She worked in a data-driven position that required sharp analytical skills.  Schultz was also required to interact with numerous other co-workers to complete her assigned tasks.  3M required that she maintain high customer-service ratings.

35.     As of the date of disability, Schultz earned a monthly wage of $5,209.75 and an annual wage of $62,516.94.

**Medical History**

36.     Schultz has a long and documented history of physical pain and psychiatric concerns.

37.     Schultz has consistently obtained medical care to treat her physical- and mental-health conditions.

38.     Schultz has been diagnosed with degenerative disc disease, arthritis, and fibromyalgia.  Her medical records document a history of low back pain.  She treats her physical ailments with the assistance of her primary-care physician, Dr. Samuel V. Hanson Willis, and other specialist physicians.

39.     Schultz has been diagnosed with major depressive disorder, generalized anxiety disorder, borderline personality disorder, and chemical dependency.  She has been under the care of a psychiatrist for at least seven (7) years and her Dialectical Behavior Therapist, Dr. Dan Carlson, for at least seven (7) years.  Since 2008, Schultz has been hospitalized approximately twice per year for psychiatric care.  She also completed chemical-dependency treatment approximately six (6) times at Hazelden Addiction Treatment Center and Pride Institute.

40.     On or about January 12, 2014, Schultz fell on ice and aggravated her low back pain.  She returned to work at 3M, but the pain following the fall did not resolve and made completing job duties difficult.

41.     From January 1, 2014 through May 15, 2015, Schultz received care from psychiatrists Dr. Travis Dunn and Dr. Jonathon Homans.  Her anti-depressant medication was actively managed by these physicians, and her reported symptoms were noted over time and assessed for connections between physical ailments, mood alterations, and external events.  Schultz's PQH-9 scores were regularly added to her medical records.

42.     From February 11, 2014 through May 19, 2015, Schultz attended DBT therapy with Dr. Dan Carlson on a twice monthly basis.  Having observed Schultz regularly, he found that when Schultz physical pain flares, she loses the ability to function.  She becomes depressed and dysregulated.  Dr. Carlson characterizes Schultz as fatigued, tearful about her ongoing physical condition, and angry and frustrated with her situation.

43.     On March 17, 2014, Schultz saw her primary-care physician, Dr. Hanson Willis, to address her back pain.  Schultz's medical records confirm that she had been dealing with back pain for approximately five (5) years.  During this medical visit, Schultz reported that her back pain was "different."  Despite acupuncture, pool therapy, and use of pain medications (oxycodone and tizanidine), Schultz continued to feel debilitating back pain.

44.     Dr. Hanson Willis determined that Schultz's back pain was due to degenerative arthritis and that she also struggled with depression and anxiety.  He noted that Schultz wanted to work, but that she struggled to manage the back pain exacerbated by sitting for long periods of time at her job.  Dr. Hanson Willis requested MRI results and referred Schultz to pain-management and occupational-health programs.

45.     Following the March 17, 2014 appointment, Dr. Hanson Willis completed and signed Schultz's 3M Disability Claim Form.  He indicated that Schultz was unable to work from February 28, 2014 through April 18, 2014.

46.     From March 18, 2014 through March 21, 2014, Schultz was hospitalized due to increased symptoms of depression.  Following her discharge, Schultz reported feeling hopeless, experiencing swings in her mood, and feeling "really up and down." Her treating physicians chose to taper her use of opioids for pain management; Schultz was responding well.

47.     On March 27, 2014, Schultz attended an appointment with Dr. Gerald Peterson of Occupational Medicine Consultants.  He identified Schultz's issue as "cervical/lumbar pain."  Dr. Peterson signed a Report of Workability for Schultz in which

he indicated that Schultz was unable to work from March 27, 2014 until cleared by a Fairview physician.

48.    Schultz attended a follow-up appointment with Dr. Hanson Willis on March 31, 2014.  She reported worsening pain.  Schultz described the pain as "a muscle aching in her legs and a sharp pain [in] her back, worse when she walks."  Dr. Hanson Willis described Schultz as "[t[earful throughout exam" and exhibiting "[p]oor function, depressed mood, affect."  He directed Schultz to try some pain-management techniques and to contact her pain-management physician about the use of ketoprofen.

49.    On or about April 10, 2014, Schultz sought treatment from Dr. Miles Belgrade—a neurologist and pain-management specialist.  She completed an elaborate patient questionnaire and underwent a comprehensive physical examination in a clinical setting.  Dr. Belgrade reviewed a July 2013 MRI and noted moderate degeneration shown by the MRI.  Dr. Belgrade diagnosed Schultz with fibromyalgia as a result of his testing.  Schultz started participating in physical therapy to improve conditioning and address her ongoing physical pain.

50.    On April 24, 2014, Schultz saw Dr. Travis Dunn for psychiatric care.  Schultz reported having "really good days, and then really bad days."  Dr. Dunn noted her previous diagnoses, medication history, current symptoms of guilt and hopelessness coupled with physical pain, and recent discharge from inpatient treatment on March 21, 2014.  Schultz presented with a PHQ-9 score of 10—a notable decrease from her previous score of 21.  Dr. Dunn linked Schultz's mood variance to her levels of pain.  He modified her prescriptions and requested a return visit.

51.     On or about May 5, 2014, Dr. Dunn completed and signed a 3M Disability Claim Form on behalf of Schultz.  He indicated that Schultz was unable to work from April 18, 2014 through May 16, 2014.  He also indicated that Schultz could return to work for four (4) hour work days beginning on May 16, 2014 and that she could return to work without restrictions beginning on June 2, 2014.

52.     Schultz attended an appointment with Dr. Dunn on or about May 30, 2014. Schultz's PHQ-9 score had dropped to 5 at her previous May 15, 2014 visit.  On May 30, her score rose back to 15.  Schultz reported suicidal ideation.  Her mood depressed significantly when she was offered a severance package from 3M.  Dr. Dunn modified her prescriptions and requested a return visit.

53.     On June 3, 2014, Schultz saw Dr. Belgrade for follow-up care after her fibromyalgia diagnosis.  Schultz continued to report neck, low back, and knee pain.  She participated in physical therapy and acupuncture.  Dr. Belgrade instructed Schultz to continue physical therapy and that her pain management would be monitored at future appointments.

54.     Schultz's pain worsened before her next appointment with Dr. Belgrade on July 2, 2014.  Schultz had attended physical therapy on the previous day, and the treatment had to be stopped due to pain.  She reported throbbing and tiring pain in the 6–10 range and increased suicidal ideation.  Dr. Belgrade encouraged Schultz to be physically active and to persist in using prescribed medications before determining that they do not work.  He also referred Schultz to a pain rehabilitation program.  She continued her physical therapy throughout the summer.

55.     In August 2014, Schultz started attending an intensive outpatient program through Pride Institute.  The treatment was intended to address her chronic pain and mental-health conditions.

56.     On September 7, 2014, Schultz attended an appointment with Dr. Homans. She reported suicidal ideation multiple times per week.  She also reported discontinuing her DBT group therapy because she felt overwhelmed.  Dr. Homans noted a GAF score of 50.

57.     Schultz sought care from an orthopedist on October 16, 2014.  She attended an appointment with Dr. Ryan Karlstad of St. Croix Orthopaedics, complaining of persistent pain in her wrists and thumbs.  She was diagnosed with bilateral Eaton Stage II first CMC joint arthritis.  Dr. Karlstad recommended a CMC joint arthrodesis procedure to her right wrist.

58.     Schultz admitted herself into the University of Minnesota Medical Center on October 30, 2014, citing suicidal thoughts spanning over three (3) days.  She received care from Dr. David Bond and Dr. Barry Rittberg.  Schultz said that "she was intermittently struggling with feelings of depression, worthlessness, appetite changes, and low energy."  She reported making plans to overdose on her medications.  Drs. Bond and Rittberg noted: "Her primary goal is to 'figure out her pain' and to 'end the train of events' that involve her chronic depression and chronic pain."

59.     Schultz's medical records from her admission to the University's medical center list Schultz's physical- and mental-health diagnoses of major depressive disorder,

generalized anxiety disorder, alcohol dependence, borderline personality disorder, chronic low back pain, and fibromyalgia.

60.     These medical records also reference a 2013 MRI that showed facet degeneration at L4-L5 and L5-S1 as the likely cause of Schultz's low back pain and previous findings of degenerative disc disease affecting her C5-C6 and C6-C7.

61.     Schultz's doctors adjusted her medications during her admission to the University of Minnesota Medical Center and introduced psychoeducation to teach stress-management skills.

62.     On November 4, 2014, Schultz was discharged from the University of Minnesota Medical Center after her suicidal ideation waned.  She was given a referral to Dr. Jonathon Homans for outpatient psychiatric care and Jean Birbis at Pride Institute for therapy.  Schultz was also directed to continue weekly DBT with Dr. Carlson.

63.     On November 13, 2014, Schultz underwent her first CMC joint arthrodesis procedure to her right wrist.  She received follow-up care on November 26, 2014 from Dr. Karlstad.  Schultz reported a positive outcome where she experienced only mild and occasional pain.  Dr. Karlstad ordered her cast be reapplied and that Schultz continue her aftercare of home exercises, application of ice, and elevation of her right hand.  Schultz was instructed to take pain medication (Percocet and Vistaril) as needed.

64.     Schultz also saw Dr. Homans on November 26, 2014 for follow-up care. The medical notes from the appointment describe Schultz's psychiatric history including eight psychiatric hospitalizations, a history of frequent passive suicidal thoughts, a history of cutting her wrists and other forms of self-harm, and one previous suicide

attempt.   Dr. Homans noted that Schultz has "notable risk factors for self-harm" that include "age, loss of job, comorbid medical condition of chronic pain, and previous suicide attempts."   He directed an increase in Schultz's dose of lamotrigine to 100 mg daily for seven (7) days with another increase to 200 mg daily to follow.

65.   Schultz saw her orthopedist, Dr. Karlstad, again on December 22, 2014. The right wrist appeared to be healing well.   Dr. Karlstad ordered Schultz's cast be reapplied and that Schultz continue her aftercare of home exercises, application of ice, and elevation of her right hand.

66.   On January 5, 2015, Schultz met with Dr. Homans.   Schultz reported adherence to her medication regimen but continued feelings of low motivation and little interest in activities.   Dr. Homans made clinical observations about Schultz, including some tearful episodes, and assessed her report about improvements in her physical pain. He ordered an EKG because Schultz was taking multiple medications that could impact her cardiac health.

67.   On January 19, 2015, Schultz returned to St. Croix Orthopaedics for follow-up care related to her right hand.   Schultz's x-rays revealed a plate fracture on the radial side, but the screws appeared secure.   Dr. Karlstad explained: "Given the fracture to the plate, I am concerned of incomplete healing."   Dr. Karlstad then immobilized Schultz's right thumb in a fiberglass cast.

68.   Schultz met with Dr. Homans on January 26, 2015 to assess her psychiatric condition.   Dr. Homans had decreased Schultz's dose of amitriptyline to 25 mg following her last appointment.   Schultz appeared at her appointment and reported feeling "at loose

ends" without enough activity to occupy her day—although she maintained little interest in leaving her house or interacting with people.   Dr. Homans observed that "lack of structure, social isolation and significant pain" were contributing to Schultz's reports of worsening depressive symptoms.   He characterized her current declining mood as "situational" and expressed hope that her participation in a pain-management program would be helpful.

69.   From February 5, 2015 through February 27, 2015, Schultz was a patient at the Mayo Comprehensive Pain Rehabilitation Center.   Multiple doctors treated Schultz. They obtained a comprehensive medical history and list of medications and developed a course of treatment for management of Schultz's back pain.

70.   Schultz underwent various forms of testing and analysis while at the Mayo Program.   Specifically, Dr. Jeannie A. Sperry conducted an abbreviated cognitive assessment of Schultz.   Dr. Larissa L. Loukianova conducted a biofeedback session to measure muscle tensions and respirations.

71.   Schultz's final treatment plan advised: following a daily schedule to provide structure and moderation, implementing a daily exercise routine to maintain physical strength and conditioning, refraining from the use of opioid and/or daily analgesic medications for chronic pain, and maintain mood-management medications and daily activity levels.   In the dismissal summary, Dr. Loukianova compared Schultz's initial PHQ-9 score (15; moderately severe depressive symptomatology) to her PHQ-9 score upon completion of the program (0; minimal depressive symptomatology).

72.     Dr. Karlstad evaluated Schultz's right hand again on March 2, 2015.  He and Schultz discussed physical therapy and using a molded splint to help reduce pain and provide protection for her right thumb.  Dr. Karlstad also introduced the possibility of a revision procedure if Schultz continued to experience pain from the broken plate.

73.     On March 2, 2015, Schultz also met with Dr. Homans.  She reported improvements in her mood following completion of the Mayo Clinic pain-management program.  Dr. Homans updated Schultz's medical records to reflect the medication changes implemented at the Mayo Clinic.  He also noted that Lyrica—a new prescription—could be causing some forgetfulness and confusion reported by Schultz. He encouraged Schultz to continue with her current treatment plan.

74.     On March 3, 2015, Schultz returned to St. Croix Orthopaedics to address right foot pain.  She saw Dr. Troy Vargas, who assessed Schultz's right foot and found insertional peroneus brevis tendonitis/tendinopathy.  Schultz's foot was tender but showed no fractures or dislocation.  Dr. Vargas recommended immobilizing the foot with an equalizer boot.

75.     Schultz underwent testing of her right thumb on March 6, 2015 with Dr. Karlstad.

76.     Dr. Vargas evaluated Schultz's right foot again on March 24, 2015.  He recommended continued use of the equalizer boot.  He also suggested therapy for functional rehabilitation after another follow-up appointment.

77.     On April 1, 2015, Dr. Karlstad examined Schultz and determined that she experienced "catastrophic failure of her hardware."  He pointed to a fall shortly after

surgery as a possible cause of the problem.  He concluded that the CMC joint did not appear to union.  Dr. Karlstad recommended revision.

78.    On April 13, 2015, Schultz also saw Dr. Homans.  She reported that her pain "continues to be significant" and that she felt like she had been "going downhill" in recent weeks.  She described low self-worth, poor focus, and decreased motivation.  Dr. Homans attributed Schultz's poor mood to "chronic pain, social isolation, and lack of structure."  He also noted a "noticeable slide in practices" that Schultz learned while at the Mayo Clinic.  They discussed "the importance of structure" in Schultz's life and how medications would not "fill that void."  Dr. Homans modified Schultz's medications by increasing lamotrigine to 300 mg daily.

79.    On April 14, 2015, Schultz saw Dr. Vargas for examination of her right foot.  Dr. Vargas noted improvement, but he recommended further use of the equalizer boot.  He also referred Schultz to a functional rehabilitation program.

80.    Schultz underwent revision of her CMC joint arthrodesis procedure on April 21, 2015.  She received follow-up care from Dr. Karlstad on May 5, 2015.  Dr. Karlstad ordered her cast be reapplied and that Schultz continue her aftercare of home exercises, application of ice, and elevation of her right hand.  Schultz was instructed to take pain medication (Percocet and Vistaril) as needed.

81.    In addition, by her May 5, 2015 appointment, Dr. Vargas recommended that Schultz wean herself out of the equalizer boot and use therapy to improve her foot condition.

82.     On May 11, 2015, Schultz met with Dr. Homans.  She reported increasing depression symptoms including feeling overwhelmed, uncontrolled crying, and passive suicidal thoughts.

### Claim History

83.     On or about March 4, 2014, Schultz notified 3M's Disability Programs Department of her need for a formal leave of absence from work.  She informed the claims specialist that her last day of work was February 27, 2014.  Schultz explained that she was suffering from lower back pain, was unable to fulfill the duties of her job, and wanted to claim short-term disability (STD) benefits.

84.     3M's Claim Administrator sent Schultz an information packet on March 5, 2014 and instructed her to provide medical documentation to the claims specialist by March 19, 2014.

85.     Schultz applied for a leave of absence and STD benefits.  On or about March 20, 2014, 3M's Claim Administrator evaluated Schultz's information and referred her file to a registered nurse for review.

86.     On or about March 24, 2014, the assigned registered nurse completed her review of Schultz's claim.  The medical information provided by Schultz was determined to be "vague" and offering "no indication of severity of condition or documentation of significant decrease in ROM [or range of motion], strength, sensation, abnormal gait." The nurse also concluded that "[o]ngoing treatment could be done w/o requiring time away from the work environment."  The nurse acknowledged Dr. Willis's diagnosis of

back pain with degenerative spine disease, but did not find the medical information to support Schultz's disability.

87.     3M issued a denial of STD benefits on or about March 26, 2014.  Its letter, also dated March 26, 2014, 3M explained that the medical documentation provided did not contain "objective medical information to support that you are unable to perform the material duties of your regular and customary occupation at 3M."  The letter cited the applicable policy terms and the medical documents considered.   The Claims Administrator identified "[i]nsufficient paperwork" as the denial basis in its claim notes. At the same time, 3M approved Family Medical Leave Act status for Schultz from February 28, 2014 through April 18, 2014.

88.     3M's Claim Administrator called Schultz on March 28, 2014 to inform her that a decision letter would be arriving by mail.

89.     Schultz appealed her STD denial by submitting an appeal form dated April 21, 2014.

90.     On or about April 24, 2014, 3M's Claim Administrator received a Report of Workability for Schultz.  The report explained that Schultz was "unable to work from 3/27/14 until cleared by Fairview physician."

91.     During the review that followed the appeal submission and the new Report of Workability, the claims specialist noted Schultz was also experiencing "depression/anxiety," in addition to "back pain due to degenerative arthritis."

92.     3M's Claim Administrator inquired into accommodating Schultz by allowing her to work from home with a standing desk.  The administrator also sought more medical information directly from Schultz's treating physicians.

93.     On or about April 28, 2014, 3M's Claim Administrator evaluated Schultz's information and referred her file to a registered nurse for review.  The assigned registered nurse determined that "[m]edical information does substantiate disability."

94.     The assigned registered nurse noted that Schultz "appears to be treating for multiple diagnosis [sic], which includes chronic back pain and depression, ongoing persistent symptomatology, recent hospitalization on 03/18/14 for suicidal ideations and was discharged on 03/21/14."  The nurse further explained, "[I]t would be reasonable to allow time for treatment, for evaluation at Fairview, for reevaluation to determine effectiveness of treatment and to have the treatment plan updated."  In addition, the nurse noted that a premature return to work by Schultz presented "potential risk of exacerbation of symptomatology, which could delay recovery and prolong [employee's] absence."  Finally, the assigned registered nurse explained that Schultz could also be experiencing cognitive impairments because of her use of narcotic pain medication to manage her back pain.

95.     Thereafter, 3M approved Schultz's receipt of STD benefits from February 28, 2014 through April 18, 2014.  On March 28, 2014, 3M's Claim Administrator called Schultz to inform her that the denial of benefits had been overturned.

96.     On March 28, 2014, the administrator also exchanged e-mails with a 3M supervisor about accommodating Schultz's back condition.

97.     Correspondence from Schultz's case manager was sent on April 28, 2014. The case manager explained that Schultz would be required to provide additional information to support her ongoing receipt of benefits.

98.     Schultz then exchanged a series of communications with 3M's Claims Administrator in an effort to extend her leave of absence and her receipt of disability benefits.  The administrator also made efforts to gather additional medical information in support of Schultz's claim.

99.     3M's Claim Administrator evaluated Schultz's information and referred her file to a registered nurse for another review on or about May 7, 2014.

100.    The assigned registered nurse concluded that "[m]edical information does not substantiate disability/restrictions."  Despite having a statement from Schultz's psychiatrist that she was unable to work from April 18, 2014 through May 17, 2014 and only able to work with restrictions from May 17, 2014 through June 1, 2014, the nurse found the claim record to be "vague" and lacking detail about Schultz's symptoms and treatment plan.

101.    Schultz's claim file was reviewed again on May 13, 2014.  Additional medical evidence had been received by the Claims Administrator, necessitating another review.  The new psychiatric information from Dr. Travis Dunn led the assigned registered nurse to conclude that "[m]edical information does substantiate disability/restrictions" up to June 1, 2014.  The nurse reiterated findings similar to those made on April 28, 2014.

102.     At the same time, 3M approved Family Medical Leave Act status for Schultz from April 19, 2014 through May 6, 2014.

103.     Schultz exhausted her Family Medical Leave Act status on May 6, 2014.

104.     Correspondence from Schultz's case manager was sent on May 15, 2014. The case manager explained that Schultz would be required to provide additional information to support her ongoing receipt of benefits.   Schultz was also expected to return to work for half days beginning May 17, 2014 and full days beginning June 2, 2014.

105.     Schultz returned to 3M, working half days, on May 19, 2014.   She continued to work half days until June 1, 2014.

106.     Schultz's case worker called on May 29, 2014 to ask about Schultz's transition back to work at 3M.  Schultz informed the case worker that she did not know if she could continue to work half days; she arranged a medical appointment and suspected her doctor would recommend another leave of absence.

107.     On the following day, 3M's Claim Administrator received a disability claim form signed by Dr. Travis Dunn.  The claim specialist promptly asked for the related medical records.

108.     On or about June 2, 2014, 3M's Claim Administrator received more psychiatric records from Dr. Dunn.   Dr. Dunn's notes explain that Schultz's psychological symptoms were made worse by recent contact from 3M offering a severance package.  Her PHQ9 and anxiety levels were reported to be much higher.  He indicated a willingness to sign a disability claim form on Schultz's behalf.

109.   On or about June 5, 2014, Schultz's supervisor at 3M contacted the Claim Administrator to report a recent conversation with Schultz where she informed him that she would not be returning to 3M on a full-time basis.

110.   On or about June 6, 2014, Schultz's claim file was reviewed again by 3M's Claim Administrator.   The assigned registered nurse recommended that Schultz's claim be reviewed by a psychiatrist due to her complex medical history.   In the meantime, 3M approved an extension of Schultz's STD benefits until June 9, 2014.

111.   In anticipation of the physician review, the Claim Administrator contacted Schultz to request more medical information.   Schultz provided the names of her treating physicians by telephone.

112.   Dr. Roger Kathol provided the physician review requested by 3M's Claims Administrator.   Dr. Kathol reviewed Schultz's claim file and return-to-work submissions from Dr. Travis Dunn and Dr. Dan Carlson—neither of which agreed with a release to return to work—but nonetheless found that no objective medical evidence supported Schultz's disability after June 10, 2014.

113.   By letter dated June 24, 2014, 3M alerted Schultz of the denial of continued STD benefits.

114.   Schultz called the Claims Administrator on June 27, 2014 to ask questions about the denial.   She was told that her claim lacked objective medical evidence of disability.

115.   Schultz submitted an appeal form on or about June 30, 2014.   She did not provide any new medical information with the appeal form.

116.   On July 3, 2014, Schultz accepted a severance package from 3M.  She agreed to leave her employment with 3M and signed a general release of all claims.  The agreement states, however, that Schultz is not releasing her claims for post-termination benefits.

117.   By letter dated July 7, 2014, Schultz's counsel requested a copy of her claim file and asked that the appeal triggered by the June 30, 2014 appeal form be put on hold to allow preparation of a more complete appeal submission.

118.   Schultz's counsel requested a second extension of time by letter dated August 5, 2014.  Schultz's claim file had not been copied and supplied to her lawyer nor had a copy of the applicable policy been disclosed.

119.   The Claim Administrator granted an extension of time through September 21, 2014 to file an appeal of the STD decision.

120.   On September 22, 2014, the Claim Administrator called Schultz's counsel to confirm five (5) remaining days in the tolling period and to remind counsel that an appeal submission must be made by September 22, 2014.

121.   Schultz submitted her full appeal by letter dated September 22, 2014.  She argued that the Dr. Kathol ignored important objective medical evidence of her diagnoses and their limiting effects.  Specifically, she cited Dr. Miles Belgrade's musculoskeletal physical examination of Schultz, which confirmed reported tenderness at 14 fibromyalgia sites.  She also noted Dr. Homans's mental-health diagnoses, Dr. Carlson's Mental Residual Functional Capacity Assessment results, and her GAF scores of 40 and 50, which indicated serious symptomatology.

122.    Schultz supplemented her appeal by letter dated October 22, 2014.   She submitted additional medical records from Dr. Homans, Dr. Carlson, Pride Institute, and her new orthopedist.

123.    3M's Claims Administrator sent Schultz's claim file to Dr. Leo Lombardo for a physician review of the pain-management issues.   Dr. Lombardo assessed the medical records from Schultz's treating physicians and determined that Schultz's pain complaints were consistent with the physicians' findings but did not support "clinical evidence of impairments."   Dr. Lombardo determined that Schultz's pain was managed with up to 80% pain relief.

124.    3M's Claims Administrator sent Schultz's claim file to Dr. Antoinette Acenas for a physician review of the psychiatric issues.   Dr. Acenas assessed the medical records from Schultz's treating physicians and therapist and determined that there was no clinical evidence to support impairment.   She relied on clinical findings of improved mood, positive effects from medication, and intact cognition as evidence that Schultz could perform her work duties.

125.    3M's Claims Administrator sent Schultz's claim file to Dr. N. Nichole Barry for a physician review of the rheumatology issues.   Dr. Barry assessed the medical records from Schultz's treating physicians and determined that there was no clinical evidence to support impairment from fibromyalgia.   Schultz's condition, according to Dr. Barry, can be managed with exercise and regular activity.   Dr. Barry also concluded that Schultz's additional issues with arthritis did not appear to place any limitations on her ability to work.

126.    By letters dated December 5, 9, and 30, 2014, Schultz again supplemented her appeal with a letter from Dr. Gerald Peterson and additional medical records.  The three physician reviewers updated their review reports to account for these additions to the claim record.   The conclusions, however, did not change—except Dr. Acenas acknowledged that Schultz's hospitalization for suicidal ideation on October 30, 2014 would have limited Schultz's ability to meet job duties.

127.    3M denied Schultz's appeal of the denial of STD benefits by letter dated January 21, 2015.  3M relied on the findings of the physician reviewers to assert that Schultz presented insufficient objective medical information to support an inability to perform the material duties of her job at 3M.  3M also made repeated mention of its reviewers' inability to reach Schultz's treating physicians for consultation.

128.    As Schultz's STD appeal progressed, she tried to apply for LTD benefits.  Specifically, Schultz called 3M's Claims Administrator on September 18, 2014 to ask about applying for LTD benefits.  She was told that once STD hours "ran out," the Claims Administrator would send the appropriate paperwork.

129.    In April and early May 2015, Schultz's counsel contacted the Claim Administrator to inquire about the LTD process.  Schultz was notified that an LTD decision could not issue until a claim had been received.

130.    By letter dated April 1, 2015, Schultz asked that an LTD file be opened to address her claim.  3M wrote a response dated April 24, 2015, wherein it explained that it would not open an LTD claim.  3M explained that LTD eligibility depended on exhaustion of STD benefits and, by its analysis, Schultz had not exhausted her STD

benefits.   3M said that it would open a claim if its STD decision was overturned and Schultz exhausted her benefits.

131.   3M issued two letters dated May 8, 2015.   First, 3M determined that Schultz may be eligible for LTD benefits and, as such, an LTD claim file would open.   In its second letter, 3M denied Schultz's claim for LTD benefits, citing her ineligibly for STD benefits beginning on June 10, 2014.   3M asserted that Schultz, by failing to exhaust her STD benefits, was ineligible for LTD benefits.

132.   Schultz appealed the LTD decision by filing an appeal on or about May 28, 2015.   Schultz asked for a review of her LTD claim on its merits.

133.   In her appeal, Schultz relied on the LTD Plan language requiring that the insured has "exhausted" STD benefits to be eligible for LTD benefits.   Schultz argued that the LTD Plan does not define "exhaustion" as the full payment of benefits to the participant for the duration of the STD period.   Schultz argued that her termination qualified as "exhaustion."

134.   Also in support of her appeal, Schultz recited her claim history and medical history, highlighting the PHQ-9 evaluations and repeated physical examinations and clinical observations that supported her diagnoses and work-related restrictions.   She also submitted additional medical information for consideration.   Schultz also argued that the previous physician reviews relied upon to deny her STD benefits failed to consider the medical evidence in the claim record.

135.   3M denied Schultz's appeal of the denial of LTD benefits by letter dated June 15, 2015.   3M again relied on its technical argument that Schultz was not eligible for

LTD benefits because she failed to exhaust her STD benefits.  3M did not address the merits of Schultz's medical evidence in its decision.

136.   Both the STD and LTD Plans only provide for one round of appeals following a denial of a claim.

137.   Schultz has exhausted her administrative remedies with 3M through its Claims Administrator.

## <u>COUNT I</u>

138.   Plaintiff restates and realleges the allegations in paragraphs 1 through 137 herein.

139.   Plaintiff is disabled under the terms of the STD and LTD Plans.

140.   Defendant's denial of STD and LTD benefits violates ERISA.  29 U.S.C. § 1132(a)(1)(B), ERISA § 502(a)(1)(B).

141.   Schultz is entitled to the maximum STD benefit of $5,209.75 per month from June 10, 2014 through exhaustion of her benefits, less any deductible sources of income.

142.   Schultz is entitled to the retroactive LTD benefits from the exhaustion of her STD benefits in the gross monthly amount of $3,125.85 ($5,209.75 x 0.60) less any deductible sources of income.

143.   By reason of the foregoing, Plaintiff is entitled to judgment against Defendant for eligibility under the STD and LTD Plans, retroactive benefits dating back to June 10, 2014, reinstatement in the plans, and ongoing disability benefits, plus interest.

## COUNT II

144.   Plaintiff restates and realleges the allegations in paragraphs 1 through 137 herein.

145.   Plaintiff has been forced to bring the instant action as a direct result of Defendant's violations.

146.   As a direct result of Defendant's acts and failures, Plaintiff has incurred attorneys' fees and costs.  Plaintiff is entitled to recover her attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), ERISA § 502(g).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Cheryl L. Schultz requests that the Court:

1.   Adjudicate that Plaintiff meets the definition of disability under the STD and LTD Plans.

2.   Adjudicate that Defendant owes Plaintiff retroactive monthly benefits under the STD and LTD Plans, plus interest, and is entitled to reinstatement under the Plans.

3.   Enjoin Defendant to pay STD and LTD benefits under the Plans, plus accrued interest.

4.   Award Plaintiff the costs, disbursements, and other expenses of this litigation, and reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g), ERISA § 502(g).

5.     Award such additional and further relief as the Court may deem just and proper.

**HELLMUTH & JOHNSON, PLLC**

Dated:  July 15, 2015          By:      /s Denise Yegge Tataryn
                                       Denise Yegge Tataryn (#179127)
                                       Karen L. Helgeson (#0387796)
                                       8050 West 78th Street
                                       Edina, Minnesota 55439
                                       Phone: (952) 941-4005
                                       Fax: (952) 941-2337

                                       **ATTORNEY FOR PLAINTIFF**
                                       **CHERYL L. SCHULTZ**

## ACKNOWLEDGMENT

The undersigned acknowledges that pursuant to Minn. Stat. § 549.211, costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find that the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass, or committed a fraud upon the Court.

Dated: July 15, 2015                    By:   /s Denise Yegge Tataryn
                                              Denise Yegge Tataryn (#179127)
                                              Karen L. Helgeson (#0387796)
                                              8050 West 78th Street
                                              Edina, Minnesota 55439
                                              Phone: (952) 941-4005
                                              Fax: (952) 941-2337